**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2316-10T2

IN THE MATTER OF THE
CERTIFICATE OF THE DEPARTMENT
OF ENVIRONMENTAL PROTECTION
GRANTING PARTIAL RELEASE OF
CONSERVATION RESTRICTIONS.

_____

Argued March 22, 2017 — Decided July 31, 2017

Before Judges Simonelli, Carroll and Gooden
Brown.

On appeal from the New Jersey Department of
Environmental Protection and the State House
Commission, Docket No. SHC 1531003 (Amended).

Renée Steinhagen argued the cause for
appellants Pinelands Preservation Alliance,
New Jersey Conservation Foundation and New
Jersey Environmental Lobby (Eastern
Environmental Law Center, and New Jersey
Appleseed PILC, attorneys; Aaron Kleinbaum and
Ms. Steinhagen, of counsel and on the briefs).

Joan M. Scatton, Deputy Attorney General,
argued the cause for respondents New Jersey
Department of Environmental Protection and
State House Commission (Christopher S.
Porrino, Attorney General, attorney; Melissa
Dutton Schaffer, Assistant Attorney General,
of counsel; Ms. Scatton, on the brief).

PER CURIAM

In this matter, appellants Pinelands Preservation Alliance,

New Jersey Conservation Foundation, and New Jersey Environmental

Lobby (collectively, appellants) opposed the proposed redevelopment of a closed and capped former landfill located in the Township of Stafford (Stafford) into a solar energy facility. There is a recorded conservation restriction on the property under the Conservation Restrictions and Historic Preservation Restriction Act (Preservation Act), N.J.S.A. 13:8B-1 to -9. The Preservation Act prohibits the release of a recorded conservation restriction, in whole or in part, without approval and certificates issued by the Commissioner of the New Jersey Department of Environmental Protection (DEP). N.J.S.A. 13:8B-6.

There are also restrictions on the property under the New Jersey Green Acres Land Acquisition and Recreation Opportunities Act (Green Acres Act), N.J.S.A. 13:8A-35 to -55, and Garden State Preservation Trust Act (GSPTA), N.J.S.A. 13:8C-1 to -42. Both the Green Acres Act and the GSPTA prohibit property held by a municipality for conservation purposes to be disposed of or diverted to another purpose without approvals by the Commissioner and State House Commission (SHC). N.J.S.A. 13:8A-47(b)(1); N.J.S.A. 13:8C-32(b)(1).

The GSPTA also prohibits the property from being conveyed for a use other than conservation purposes without the Commissioner's and the SHC's approvals. N.J.S.A. 13:8C-32(b)(1). The GSPTA further prohibits granting the approvals unless the municipality

agrees to replace the property "with lands of equal or greater fair market value and of reasonably equivalent size, quality, location, and usefulness for . . . conservation purposes, as approved by the [C]ommissioner," or "pay an amount equal to or greater than the fair market value of the lands, as determined by the [SHC]." Ibid.

This appeal concerns the SHC's October 23, 2014 approval of Stafford's amended diversion application to lease a portion of the landfill site to a redeveloper to install renewable energy facilities, and DEP's December 1, 2015 approval and issuance of an amended certificate granting partial release of the conservation restrictions to accommodate the project. For the reasons that follow, we affirm.

I.

Stafford's Redevelopment Plan
for the Stafford Business Park

In 2005, Stafford adopted a redevelopment plan pursuant to the Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-1 to -49, to construct the Stafford Business Park (Business Park), an approximately 370-acre mixed-use brownfield redevelopment project located within the Pinelands Regional Growth Area of the Pinelands National Reserve in Ocean County. Stafford proposed commercial, residential, and government component uses on the site.

Two abandoned municipal landfills occupied portions of the site. The Old Stafford Township Landfill (Old Landfill), which operated from 1958 to 1970, was located on approximately twenty-five acres on the eastern side of the proposed Business Park. Relevant here is the Stafford Township Landfill (Landfill), which operated from 1970 to 1983, and was located on approximately fifty-five acres on the western side of the proposed Business Park.

In 2005, both landfills were still leaching hazardous chemicals into the surface waters and groundwater. Pursuant to a redevelopment plan, Stafford proposed closing both landfills in accordance with the regulations governing landfill closure and post-closure care in the Pinelands, N.J.A.C. 7:26-2A.9 and N.J.A.C. 7:50-6.75. Specifically, Stafford proposed excavating and remediating all buried waste at the Old Landfill, reusing any non-hazardous waste to close the Landfill, and constructing an impermeable cap over the Landfill.

Stafford engaged a redeveloper for the project, Walters Group (Walters), and submitted a redevelopment plan to the New Jersey Pinelands Commission (Pinelands Commission) for compliance review and approval under the Pinelands Comprehensive Management Plan (Pinelands CMP), N.J.A.C. 7:50-1.1 to -10.35. The Pinelands Commission determined that Stafford's landfill plan was inconsistent with the Pinelands CMP's minimum requirements for

wetland buffers (which are not at issue here), and threatened and endangered (T&E) plants and animal species, including the Northern Pine Snake (which are at issue here).

To bring Stafford's plan into compliance with the Pinelands CMP, in 2006, the Pinelands Commission, Stafford, and Ocean County entered into a memorandum of agreement (the 2006 MOA). Section VI(A)(15) required Stafford to: (1) execute a conservation restriction against future development so that the Landfill site of 59.593 acres and other open space areas remain undeveloped open space in perpetuity; (2) incorporate low impact design measures and green building design features and techniques throughout the Business Park; and (3) submit a species management plan designed and implemented to protect T&E species during the project and reestablish them afterwards on or near the site or at other appropriate areas designated by the Pinelands Commission and NJDEP.

In addition, in order to provide an equivalent level of protection of the Pinelands resources, Section VI(A)(14) required Stafford

> to purchase and deed restrict against future development at least 570 acres of land (at least three times the forested lands to be disturbed as a result of the implementation of the [c]losure and [r]edevelopment [p]lans) in the [f]orest [a]rea [of the Pinelands], a portion of which will be located within the

Mill Creek drainage area to offset for wetlands impacts, and the remainder of which will constitute suitable [Northern Pine Snake] habitat.

The 2006 MOA also required Ocean County to purchase seventy-five acres of land that constituted suitable habitat for the Northern Pine Snake as part of its open space acquisition program. The 2006 MOA did not mention solar or any other renewable energy facilities or services.

<u>The Conservation Restriction</u>

As required by the 2006 MOA, on December 11, 2006, Stafford recorded a Declaration of Covenants and Restrictions, placing a conservation restriction on the portion of the Business Park that included the Landfill (the conservation restriction). The stated purposes of the conservation restriction were:

> a. that the [r]estricted [a]rea . . . be protected in its natural, scenic, open and existing state, in perpetuity, subject only to the specific rights reserved to [Stafford] herein;
>
> b. that the natural features of the [r]estricted [a]rea shall be respected and preserved to the maximum extent consistent with [Stafford's] exercise of the rights expressly reserved to [Stafford] . . . [herein]; and
>
> c. that the [r]estricted [a]rea be forever protected and preserved in its natural, scenic, open and existing state free from all activities that might damage, compromise or interfere with the ecological diversity,

A-2316-10T2

natural beauty or resource quality, or with the natural processes occurring therein[.]

The conservation restriction provided

> that [Stafford's] [p]roperty shall be held, transferred, sold, conveyed, leased and occupied subject to the following covenants, conditions, obligations and restrictions hereafter set forth:
>
> 1. Except as specifically set forth herein, the [r]estricted [a]rea may not be developed in any manner whatsoever and shall remain in its natural condition. . . .
>
>      . . . .
>
> 2. Notwithstanding the above, the [r]estricted [a]rea may be disturbed solely to permit the construction, installation, maintenance and repair of the following: (i) stormwater basins . . . ; (ii) the landfill cap; (iii) access roads . . . [;] and (iv) the proposed [fifteen foot] wide access road to the compost and chipping areas all in accordance with the terms of the [2006] MOA, the [c]losure [p]lans and such other plans as [may be] approved by []DEP and the [Pinelands] Commission and subject to compliance with applicable local, county, state and federal law, rules, regulations and ordinances. . . . Once implementation of the [c]losure [p]lans is completed, the [r]estricted [a]rea . . . shall be graded and revegetated with native Pinelands vegetation.
>
> 3. [Stafford], for itself, its successors, transferees, or assignees, agrees to leave the [r]estricted [a]rea unmolested and in [its] natural state.

Under the conservation restriction, the Pinelands Commission had the right to determine the consistency of any activity or use for which the restriction made no express provision.

Sometime after Stafford recorded the conservation restriction, it accepted Green Acres funding for other projects in the township. As a result of accepting this funding, the restricted area already encumbered by the conservation restriction also became encumbered with Green Acres restrictions and was characterized as "unfunded parkland" within Stafford's recreation and open space inventory.[1]

By 2010, Walters had removed the hazardous contents of the Old Landfill, filled it, and developed it into a retail shopping center. Walters had also closed and capped the Landfill. Public funds were not used for either project.

In addition, as required by the 2006 MOA, Walters had developed, in conjunction with DEP and the Pinelands Commission, a seven-year species management plan under which: T&E plants were relocated from the landfills before they were disturbed; new habitat for the Northern Pine Snake was constructed; an extensive

---

[1] Whenever a municipality accepts Green Acres funding, all land it holds for recreation and conservation purposes, even if such properties had not been acquired or developed with those funds, become encumbered with Green Acres restrictions. Cedar Cove, Inc. v. Stanzione, 122 N.J. 202, 205 (1991).

snake monitoring program was implemented; and Stafford and Ocean County purchased and permanently preserved 1070 acres to offset the impacts to both T&E habitats and wetlands. Further, pursuant to a settlement agreement in an unrelated action brought by the Pinelands Preservation Alliance, Walters agreed to pay $1 million for Stafford to purchase the offset land.

### Stafford's Lease with Walters

Early in construction of the Business Park, Walters and Stafford began to consider using the Landfill and its adjoining lands for the development of renewable energy facilities, including installation of solar panels and wind turbines. Walters had already installed solar arrays on the rooftops of the retail facilities in the Business Park and affordable housing rental apartments, and had worked on Rutgers University's two-year wind resource study conducted on the Landfill and its adjoining lands.

In the summer and fall of 2010, Stafford and Walters approached DEP and the Pinelands Commission to discuss a renewable energy proposal. Stafford proposed to lease 46.8 acres of the Landfill to Walters for thirty years to construct, install, and operate a 6.5-megawatt, 1026-panel solar array to supply energy to the facilities in the Business Park. In return, Walters would pay Stafford annual rent ranging from $65,000 to $150,000, along with a sixth- and eleventh-year escalator of ten percent. The

lease would also provide for two ten-year renewals, subject to Stafford's approval, and would allow Walters to explore future installation of four 1.5-megawatt wind turbines and methane gas production.

During the discussions with the agencies, Walters submitted an August 2010 ecological assessment report prepared by Robert T. Zappalorti, Executive Director of Herpetological Associates, Inc. After reviewing the Landfill site, Zappalorti concluded that the construction, installation, and on-going operation of 1026 solar panels would be compatible with the wildlife on site. He also concluded that the solar panels would not have any direct or secondary adverse impacts upon the Northern Pine Snake, tree frog, or two rare plant species known to occur in the vicinity of the Business Park and Landfill.

Zappalorti explained that the proposed 1026 solar panels would be erected and positioned to run from east to west for optimal sunlight exposure. Each panel would be about twenty-seven feet wide and sixteen feet long, and would sit on two concrete foundations that were fourteen feet long and two feet wide, with twenty feet between the rows of solar panels to allow for mowing grasses and general maintenance. The low end of a panel would be about four feet above grade, and the high end would be about twelve feet above grade. All connecting wires would run above ground and

overhead, and there would be no excavation into the soil on the Landfill surface.

DEP approved an amendment to Stafford's landfill closure plan to allow for the development of renewable energy facilities on the Landfill. On September 27, 2010, Stafford held a "scoping hearing" on this proposed use, at which appellants and several members of the public voiced their objections.[2]

Three days later, Stafford filed an application with DEP and the SHC, seeking approvals for a major diversion from the conservation restriction to lease a portion of the Landfill to Walters for installation of renewable energy facilities to serve the Business Park. Stafford also applied to the DEP for a certificate to partially release the conservation restriction. On October 14, 2010, Stafford held a public hearing on its diversion application. Appellants and several members of the public voiced their objections and submitted written comments.

On November 7, 2010, DEP approved the diversion application and referred the matter to the SHC. DEP considered various factors for preserving the site in its natural state, including the project's public need and public benefit, environmental impact,

---

[2] N.J.A.C. 7:36-26.8 requires a municipality to conduct a "scoping hearing" to solicit preliminary public comment before submitting an application to NJDEP for a major diversion of parkland.

and possible alternatives. DEP also considered the oral and written public comments and finding of the Pinelands Commission, which advised that the solar project would not require a deviation from the Pinelands CMP. DEP determined that the solar project would provide a variety of public needs and benefits; the diversion would have no irreparable impact on habitats for T&E plants and animals; and there were no feasible alternatives.

As to public need and benefit, DEP noted that Stafford and Walters had been incorporating green buildings to reduce the redevelopment's impacts on the Pinelands. DEP stated: "The rooftop solar arrays already installed by Walters provide approximately 30% of the energy needs for the retail stores they serve and nearly 100% of the common area power needs for the affordable housing residents." In addition, various agencies, including the Board of Public Utilities (BPU) and other DEP divisions, had encouraged Stafford and Walters to explore additional renewable energy uses on the Landfill. Walters estimated that approximately seventy percent of the Business Park's energy needs could be provided by developing solar and wind facilities, and that the benefits of reducing the carbon footprint of development benefitted the citizens of Stafford, Ocean County, and the State.

DEP further noted that the level of renewable energy at a mixed use project of this scale was unprecedented, and Walters had

proved that sustainable building practices can be utilized in a cost effective manner. Thus, DEP concluded that the environmental features of the redevelopment project were a direct benefit to Stafford and Ocean County, and the innovative design features were a model for other development in the region and State.

As to environmental impacts, DEP stated that the 2006 MOA required Stafford and Walters to preserve at least 570 additional acres for Northern Pine Snakes and other T&E species; they had already acquired and preserved significantly more than that acreage; and Walters had paid $700,000 of the $1 million settlement with the Pinelands Preservation Alliance. DEP further noted that the Pinelands Commission had agreed to accept approximately $153,000 as recompense for amending the 2006 MOA to allow the proposed solar use, and had not found the project would have any irreparable impact on the habitat for T&E species. Thus, DEP concluded that the diversion would not have any irreparable impact on habitats for T&E plants or animals, and there was no need for additional mitigation or compensation to offset the diversion's anticipated environmental impacts.

As to other alternatives, DEP first noted that the solar energy generated from the project was not proposed in the abstract; it would be used by end users within the Business Park. DEP then concurred with Stafford's findings that: (1) a "no action"

13                                          A-2316-10T2

alternative was not reasonable or feasible, since it would thwart Stafford's goal of maximizing the production of renewable energy to serve the Business Park; and (2) other alternatives were not reasonable or feasible because Walters had already maximized rooftop space for solar installation, and because the only other available land for solar installation was part of the Garden State Parkway or restricted by the Pinelands Commission.

Thus, based on the project's minimal environmental impact, the proposed generated lease revenue, the extensive mitigation compensation already associated with the redevelopment project, and the State's efforts to promote the use of capped landfills for solar energy generation, DEP concluded there were no feasible alternatives to building the project and locating it on the Landfill. DEP explained that even though the 2006 MOA never mentioned solar uses, if discussions about these uses had occurred when the parties discussed entering into the 2006 MOA, both the 2006 MOA and the conservation restriction would most likely have allowed these uses to occur without any additional compensation to either Stafford or the Pinelands Commission. Lastly, DEP noted that the lease renewals, use of wind turbines, and methane gas production were not part of its approval, and those proposals had to be resubmitted to DEP and the SHC for future review and approvals, as appropriate.

14                                          A-2316-10T2

DEP provided a list of public benefits associated with the overall redevelopment project, including the closure of both landfills without using public funds, and the required environmental mitigation measures and conditions. DEP also provided its responses to the public comments. First, DEP rejected comments that the solar project did not meet the thresholds of N.J.A.C. 7:36-26.1(d)(1), which states an applicant must show that the proposed diversion is for a project that either will: (1) "[f]ulfill a compelling public need . . . by mitigating a hazard to the public health, safety or welfare;" or (2) "[y]ield a significant public benefit . . . by improving the delivery by the local government unit or nonprofit, or by an agent thereof, of essential services to the public or to a segment of the public having a special need[.]" DEP declared:

> As a matter of longstanding agency interpretation, [DEP] has generally considered utility projects such as the proposed diversion to fall into the "public benefit" category. Although most electric and gas projects are not constructed by a local government unit or nonprofit, the provision of energy is an essential service, and both public and private utility companies provide a commodity that local governments would otherwise be required to provide (such as many municipalities still do for water and sewer services.) Therefore, the fact that the project is sponsored by a private, for-profit enterprise has not in the past disqualified consideration of a diversion application.

15                                           A-2316-10T2

Second, DEP rejected comments that the solar project did not meet the threshold of N.J.A.C. 7:36-26.1(d)(2), which states that an applicant must show "that there is no feasible, reasonable and available alternative" to the diversion. After reviewing Stafford's alternatives analysis, DEP concurred that it would not be feasible to locate another site for this project outside the redevelopment area given the strict regulation of the surrounding area under the Pinelands CMP.

Finally, DEP rejected comments that Stafford should have proposed replacement land for the diversion at a four-to-one replacement ratio. Compensation standards for this project involving a lease are found in N.J.A.C. 7:36-26.10(c)(2), which states only that DEP will assess "whether the compensation that the applicant proposes to receive for the lease or use agreement is fair and appropriate[,]" and "shall require that any payments, rentals or other consideration received by the applicant from the lease or agreement be used by the applicant for its operating, maintenance or capital expenses related to its funded parkland or to its recreation program as a whole[.]" No land compensation is required in that standard. DEP declared:

> Under N.J.A.C. 7:36-26.10(d)7, []DEP does have the ability to require additional compensation to address natural resource impacts or mitigate other adverse impacts associated with a proposed diversion or disposal. However,

16

unlike the recent Tennessee Gas Pipeline transaction, in which the State requested replacement land for the subsurface installation of a natural gas pipeline that required blasting and trenching, this project involves the minimally obtrusive installation of solar panels on the surface of a capped landfill. At the end of the lease, it is not unreasonable to assume that the panels can be removed and the site restored to its pre-lease condition. Therefore, the []DEP has not required replacement land for this application.

As required by N.J.A.C. 7:36-26.10(c)2ii, [Stafford] will use the lease proceeds for its operating, maintenance or capital expenses related to its funded parkland or to its recreation program as a whole.

On November 12, 2010, the Pinelands Commission, Ocean County, and Stafford agreed to amend the 2006 MOA to incorporate renewable energy facilities and allow Stafford's execution of a Restated and Amended Declaration of Covenants and Restrictions (the 2010 amended MOA). The 2010 amended MOA altered, among other provisions, Section VI(A)(15) of the 2006 MOA to include the parties' agreement that renewable energy facilities on the Landfill were permitted, except on storm water basins, on wetlands and buffers, and on approximately twenty acres that the County already had leased for composting facilities.

The 2010 amended MOA also provided that

[i]n order to ensure that there continues to be adequate measures provided to afford, at a minimum, an equivalent level of protection of

17

the resources of the Pinelands, despite the [p]arties agreeing to permit the development of [r]enewable [e]nergy [f]acilities on the lot comprising the . . . Landfill . . . [Stafford] has obligated [Walters] to make a monetary contribution to the [Pinelands] Commission in the amount of $152,900. This contribution shall be utilized by the [Pinelands] Commission to undertake an assessment of the existing landfills located in the Pinelands [a]rea that have not, as yet, been closed[.]

On November 19, 2010, appellants notified the SHC of their objection to the proposed diversion. Appellants acknowledged that solar energy generation is a good thing, but mainly complained about the lack of replacement parkland to compensate for the diverted land.

At its November 22, 2010 meeting, the SHC heard public comments on the proposed renewable energy project. Stafford's administrator stated that Stafford had no replacement land available to compensate for the diversion. A representative from DEP said that no replacement land was required for diversions involving leases when the surface use can be removed at the end of the term and the site remains parkland. At the end of the meeting, the SHC unanimously voted to approve Stafford's diversion application.

On December 20, 2010, DEP issued a certificate granting partial release of the conservation restriction. DEP acknowledged

A-2316-10T2

its statutory duty to consider the public interest in preserving land in its natural state along with any comprehensive land use or development plan affecting the property. DEP noted that the property was not used for recreation of any kind and was restricted from general public access due to security concerns associated with the landfill cap, but was required by the 2006 MOA to be planted with grasses and allowed to revert to a natural state and remain undeveloped. DEP further stated that the construction activities associated with the project consisted primarily of the installation of concrete footings on the Landfill surface and attachment of freestanding solar panels to the concrete footings.

DEP also found that although the project required the use of surface areas, the remainder of the property would remain undeveloped. DEP then limited the term of the partial release to thirty years. Thus, for the same reasons DEP approved Stafford's diversion application, it determined it was in the public interest to issue a certificate approving a partial release of the conservation restriction to allow the solar project.

On January 11, 2011, Stafford recorded the DEP's certificate and a Restated and Amended Declaration of Covenants and Restrictions. On January 24, 2011, Stafford and Walters signed the lease agreement. Article VIII, Sections 8.4 to 8.6, covered compensation offsets. Section 8.4 stated that even though Stafford

19                                                      A-2316-10T2

and Walters contended that no offset (by way of the purchase and restriction of land, the payment of money or other consideration) was due, Walters agreed to satisfy any offset that DEP imposed on Stafford. Section 8.5 stated that Walters agreed to pay a separate offset of $152,900 required by the Pinelands Commission. Section 8.6 stated that Walters agreed to pay, on Stafford's behalf, any other offset required by government agency or ordered by court. In all three sections, Walters reserved the right to challenge the offset in appropriate legal proceedings or cancel the lease.

Initial Notice of Appeal

Appellants appealed from the November 7, 2010 approval of Stafford's diversion application, and the December 20, 2010 certificate granting partial release of the conservation restriction. While the appeal was pending, appellants moved to supplement the record with the certification of Emile DeVito of the New Jersey Conservation Foundation, who certified that he had walked on the Landfill in May 2012, and saw new T&E bird species. In an email that same month, Dave Jenkins, Chief of DEP's Division of Fish & Wildlife, Endangered and Nongame Species Program (Division), said the Division would try to verify sightings of the Northern Pine Snake on the Landfill. Jenkins admitted that the Pinelands Commission had not consulted the Division before it signed the 2010 amended MOA, which allowed the solar project, and

DEP had not consulted the Division before approving the diversion application.

We remanded for DEP and the SHC to reconsider the appropriate replacement land for the changed use and the project's effect on T&E species and habitats.

Proceedings on Remand

By November 2012, Walters had constructed twelve percent of the solar project, occupying approximately 4.4 acres of the leasehold site. That month, DEP found that a portion of its decisions, specifically allowing Stafford to retain lease proceeds, was inconsistent with N.J.S.A. 13:8C-32(b)(1), which requires a municipality: (1) to replace diverted parkland with lands of equal or greater market value and of reasonably equivalent size, quality, location, and usefulness for recreation and conservation purposes; or (2) to pay an amount equal to or greater than the fair market value of that diverted land into the Garden State Preservation Trust for land acquisition. Thus, DEP determined that Stafford had to amend its diversion application and seek a new certificate granting the partial release of the conservation restriction.

On November 22, 2012, DEP executed a remand order that established a compliance schedule for Stafford to amend its diversion application. The order also directed Stafford to submit:

(1) a revised compensation proposal, reflecting substitution of proposed replacement land for lease payments; (2) information about the proposed replacement land; and (3) a report analyzing the merits of appellants' claim concerning irreversible impacts to T&E species. On December 16, 2013, the SHC approved DEP's remand order.

On December 11, 2013, Stafford submitted an amended diversion application to DEP and the SHC, and asked for approval of a smaller partial release of the conservation restriction. Stafford proposed reducing the size of the solar project from 46.8 acres to 33.86 acres. Stafford also proposed compensating for the diversion with replacement land on a one-to-one acre ratio that would be deed restricted for use as parkland. Specifically, Stafford offered two non-contiguous unencumbered parcels located near a national wildlife refuge, totaling approximately 40.85 acres of undeveloped wooded land containing wetlands and accessible only via a local trail system. Stafford claimed that the replacement land was unlike the Landfill site, where public access was inaccessible due to security concerns about the cap.

Stafford's expert, Richard E. Hall, appraised the market value of the diverted land at $27,000, and the market value of the replacement land at $114,500. Thus, Stafford asserted that its proposed replacement land was approximately 1.2 times the size of

the proposed diversion and 4.7 times the appraised market value. A DEP Appraisal Section supervisor subsequently determined, after reviewing Hall's appraisal, that the replacement land Stafford proposed satisfied the lot size and dollar value requirements representing an equitable exchange.

Stafford also revised the lease with Walters to make rent payments a percentage of the cash flow earned from any portion of the solar project, and provide that Walters make a one-time rental payment of $114,377 (the appraised value of the replacement land). As the remand order required, Stafford also submitted a revised ecological assessment report Zappalorti prepared in November 2013, which analyzed the merits of appellants' claims concerning impacts to T&E species. Zappalorti conducted a new habitat inspection and evaluation of the Landfill site, and concluded that installation of all of the proposed 1026 solar collection panels would not have an irreversible adverse impact upon habitats that are critical to the survival of the local population of any rare plant or wildlife species on the Business Park. He stated there would be no excavation into the soil on the Landfill surface for any reason whatsoever, as digging could possibly rupture the capped lining.

Zappalorti also concluded that the inadvertently-created grasslands would only be partially disturbed by the installation of solar panels, and there would be minimal need to access the

panels or disturb the grassy habitat. He noted that rare birds were breeding on the Landfill because Walters had agreed, at appellants' request, to plant more expensive and diverse grasses than Ocean County's soil conservation district specialists had required. Zappalorti stated that if the Landfill was not mowed within three to five years, it would no longer be suitable for grassland birds.

As for the Northern Pine Snake, Zappalorti found that the Landfill site was only suitable for foraging, and noted that two individual snakes had been confirmed foraging there. The site, however, was not suitable for winter denning due to the limited depth of the cap liner, or for nesting due to dense grass and other vegetation.

On February 10, 2014, Stafford held a public hearing and accepted written comments on the amended project. Appellants submitted oral and written objections. They also submitted a February 18, 2014 report from Joseph Zurovchak, Ph.D., an ecologist specializing in ornithology, who opined that installation of a solar array on the Landfill site would negatively impact local populations of grassland birds and render the existing habitat unsuitable.

On August 25, 2014, Stafford submitted a revised alternatives analysis to DEP. Stafford analyzed a "no action" alternative

along with placing the project at other locations in and adjacent to the Business Park and farther. Based on that analysis, Stafford concluded there were no feasible, reasonable, or available alternatives for meeting the essential purpose of the proposed solar project. Stafford determined that the Landfill site was still the most logical and only appropriate and reasonable location for the planned renewable energy facilities. Stafford further noted that, as a State regulatory matter, solar facilities had to be on-site or adjacent to their end users in order to qualify for financial incentives making them economically feasible. The cost to extend off-site renewable energy infrastructure to the Business Park would be prohibitive. Stafford also submitted a summary of the submitted public comments and Stafford's responses.

### Approval of the Amended Diversion Application and Issuance of the Amended Certificate Granting Partial Release of Conservation Restrictions

On October 1, 2014, DEP approved Stafford's amended diversion application and referred the matter to the SHC. In an accompanying memorandum, Judeth Piccinini Yeany, Chief of DEP's Bureau of Legal Services and Stewardship, Green Acres Program, detailed DEP's reasons for recommending approval of the amended diversion application.

First, DEP found that the two wooded parcels Stafford offered as replacement lands were reasonably equivalent as appropriate

replacements for a partial diversion of the Landfill's grasslands. DEP determined that those parcels were in a location that would be accessible to the public, in close proximity to other preserved lands, and in an area already serving as habitat for T&E species. DEP acknowledged that the replacement lands did not provide the exact grassland characteristics that the proposed diversion area was alleged to possess, but concluded the proposed replacement lands were ecologically significant in their own right. DEP believed the replacement lands provided breeding and foraging habitat for various birds and the Northern Pine Snake.

DEP further explained that its use of a one-to-one land replacement ratio based on value and size was

> consistent with the statutory standard at N.J.S.A. 13:8C-32(b)(1) (which does not specify a replacement ratio greater than 1:1), the policy objectives of N.J.A.C. 7:36-26.10(c)(2)(ii) (which were intended to take into account the fact that leases of parkland do not involve permanent conveyances of property interests), and the fact that the parkland interest at issue in this application is a partial interest (conservation restriction) and not a full fee interest.

Second, based on its review of Zappalorti's November 2013 report on T&E species, the information appellants provided, and its own site visit, DEP concluded that impact to T&E species was not a reason to deny Stafford's amended diversion application. DEP noted that the following factors weighed against any denial:

26

(1) Walters had based the original project siting and investment decisions on the requirements in the 2006 MOA and 2010 amended MOA to protect the four known T&E species at the site; (2) Walters and Stafford had reduced the proposed diversion area; (3) Walters originally had agreed, at appellants' request, to plant more expensive and diverse grasses on the Landfill than were present and would otherwise have been required; (4) Stafford and Walters had a continuing obligation under the 2010 amended MOA to contact the Pinelands Commission and DEP if they encountered any new T&E species; and (5) the solar project would benefit the public. Although appellants allegedly had sighted T&E birds, DEP found no evidence that these bird species were observed during Walters' initial construction phase of the solar project.

Further, DEP noted that, as part of the redevelopment project, Stafford, Walters, and Ocean County already had offset impacts to T&E species and their habitats by: (1) deed restricting approximately 1017 acres of land, despite only 645 being required by the Redevelopment Project agreement; (2) Walters paying approximately $836,000 to the New Jersey Natural Lands Trust for land preservation; and (3) Walters paying $153,000 to the Pinelands Commission, on behalf of Stafford, to fund a study of existing unclosed landfills within the Pinelands Area in order to determine the continuing environmental impacts associated with them and the

27                                                              A-2316-10T2

appropriate means of closure to ameliorate those impacts. Thus, balancing the equities of the amended diversion application and exercising its discretion, DEP decided not to deny Stafford's application on the basis of T&E impacts.

Prior to the SHC's meeting on October 23, 2014, Stafford and Walters signed a first addendum to the lease incorporating their revised changes. At the meeting, Yeany explained why DEP had rejected the public's demand for a four-to-one compensation ratio of diverted land to replacement land required for a private diversion. She declared that the solar project involved a lease, not a permanent fee taking, and was part of a hybrid public-private partnership involving a larger redevelopment project. She stated: "This category of projects really then fell through the cracks and really wasn't covered by our rules [on replacement land compensation for a major diversion]." She concluded that the solar project only required a one-to-one ratio for replacement land, pursuant to the requirements in N.J.S.A. 13:8C-32(b)(1).

Yeany also explained that the Green Acres Program would not supersede the Pinelands Commission's approval of the solar project. The Pinelands Commission had its own endangered species office, and had provided for mitigation of impacts on T&E species in the 2006 MOA and 2010 amended MOA. On October 23, 2014, SHC approved Stafford's amended diversion application.

On December 1, 2015, DEP issued an amended certificate granting a partial release of the conservation restrictions. DEP incorporated the analysis and findings set forth in the original November 7, 2010 diversion approval, and again acknowledged its statutory duty to consider the public interest in preserving land in its natural state along with any comprehensive land use or development plan affecting the property. DEP also noted that Stafford had amended the project by reducing the diversion area to approximately thirty-four acres, offered approximately forty acres of replacement land for the diverted area, and accepted revised financial terms for the underlying lease. DEP also noted that the Pinelands Commission had approved the 2010 amended MOA, in exchange for additional mitigation measures, and that the SHC had approved Stafford's amended diversion application.

DEP again noted that the Landfill site was not used for recreation of any kind, and was restricted from general public access due to security concerns associated with the cap, but was required by the 2006 MOA to be planted with grasses, allowed to revert to a natural state and remain undeveloped. DEP stated that the construction activities associated with the solar project consisted primarily of the installation of concrete footings on the former landfill surface and the attachment of freestanding solar panels to the concrete footings. DEP also found that

although the project required the use of surface areas, the remainder of the property would remain undeveloped. Thus, for the same reasons DEP had approved Stafford's original and then amended diversion applications, DEP determined it was in the public interest to issue an amended certificate approving a partial release of the conservation restrictions to allow the solar project.

## II.

Appellants contend that DEP's decision to partially release the conservation restriction was not in accordance with the law because DEP failed to consider the public's interest and the decision conflicts with the requirements of the Pinelands CMP.

Our role in reviewing an administrative agency's decision is limited. Pub. Serv. Elec. & Gas Co. v. N.J. Dep't of Envtl. Prot., 101 N.J. 95, 103 (1985). We will not reverse the agency's decision unless: (1) it was arbitrary, capricious, or unreasonable; (2) it violated express or implied legislative policies; (3) it offended the State or Federal Constitution; or (4) the findings on which it was based were not supported by substantial, credible evidence in the record. Univ. Cottage Club of Princeton N.J. Corp. v. N.J. Dep't of Envtl. Prot., 191 N.J. 38, 48-49 (2007).

"In reviewing an administrative agency's decision, we will grant considerable deference to the agency's expertise, where such

expertise is a relevant factor." In re Petition of S. Jersey Gas Co., 447 N.J. Super. 459, 480 (App. Div. 2016). We "may not second-guess those judgments of an administrative agency which fall squarely within the agency's expertise." In re Stream Encroachment Permit No. 0200-04-0002.1 FHA, 402 N.J. Super. 587, 597 (App. Div. 2008).

"Ordinarily, DEP is given great deference when it applies its considerable expertise and experience to the difficult balance between development and conservation." Ibid. (citations omitted). "However, '[w]hile we must defer to the agency's expertise, we need not surrender to it.'" Pinelands Pres. All. v. State, Dep't of Envtl. Prot., 436 N.J. Super. 510, 524 (App. Div.) (citation omitted), certif. denied, 220 N.J. 40 (2014). "The party who challenges DEP's decision to permit development of a certain location has the burden of demonstrating, not that the agencies' action was merely erroneous, but that it was arbitrary." Stream Encroachment Permit, supra, 402 N.J. Super. at 597 (citations omitted).

Furthermore, although we "must give deference to the agency's findings of facts, and some deference to its 'interpretation of statutes and regulations within its implementing and enforcing responsibility,' we are 'in no way bound by the agency's interpretation of a statute or its determination of a strictly

31                                                          A-2316-10T2

legal issue.'" Utley v. Bd. of Review, Dep't of Labor, 194 N.J. 534, 551 (2008) (citations omitted). Applying the above standards, we discern no reason to disturb DEP's and the SHC's decisions.

### The Public Interest

Appellants argue that DEP violated N.J.S.A. 13:8B-5 and -6 by failing to adequately consider the public's interest in preserving the Landfill in its natural state in perpetuity, which was one of the conditions imposed in the conservation restriction. Appellants aver that DEP never discussed the public's interest in preserving the Landfill as open space for the local plants and wildlife, and it was not enough to find that the Landfill would be a convenient location for the solar project.

The Preservation Act generally "authorizes the assignment of conservation restrictions . . . to insure that the land governed by the restrictions will be maintained in its natural integrity." Vill. of Ridgewood v. Bolger Found., 104 N.J. 337, 343 (1986). The Preservation Act provides the only statutory mechanism for a conservation restriction to be released, removed, or altered:

> A conservation restriction . . . may be
> released in whole or in part, by the holder
> thereof, for such consideration, if any, as
> the holder may determine, in the same manner
> as the holder may dispose of other interests
> in land, subject to such conditions as may
> have been imposed at the time of creation of
> the restriction . . . .

[N.J.S.A. 13:8B-5.]

The statute does not bar the holder of a conservation restriction from ever releasing it.

In addition, N.J.S.A. 13:8B-6 provides as follows:

> The provisions of [N.J.S.A. 13:8B-5] notwithstanding, no conservation restriction acquired pursuant to this act shall be released without the approval of the Commissioner of [DEP]. Approval of releases shall be evidenced by certificates of the Commissioner of [DEP] and shall be recorded in the same manner as the restriction itself. In determining whether the release should be approved, the Commissioner of [DEP] shall take into consideration the public interest in preserving these lands in their natural state, and any State, regional or local program in furtherance thereof, as well as any State, regional or local comprehensive land use or development plan affecting such property.

It is clear from the plain language in the statute that the Legislature intended to establish a process for allowing recorded conservation restrictions, even those to be held in perpetuity, to be released or modified after their creation. Thus, DEP did not violate the Preservation Act by partially releasing the conservation restriction, even though the restriction was created with the intention of preserving the Landfill in its natural state in perpetuity.

In evaluating and determining whether to approve a diversion application, as part of its analysis, DEP must weigh the competing

33

public interests presented by the proposed diversion against preservation of the parkland in its natural state. See N.J.S.A. 13:8B-6; N.J.A.C. 7:36-26.1(d)(1).

Here, DEP considered the public's interests in preserving the Landfill as open space when it balanced the public benefits and needs for a solar project to power the Business Park's facilities against the fact that most of the leased area would remain in its natural state. DEP explained how the solar project would yield significant public benefit in the form of renewable energy for a public redevelopment project. The solar project will generate approximately 6.5 megawatts of new solar energy on the now-capped surface of the Landfill, increasing renewable energy to a mixed use brownfield redevelopment site that includes residential and retail development, as well as public administration buildings. As DEP explained in its approval of Stafford's original diversion application, approximately 70% of the energy needs for the entire redevelopment project can be provided through renewable energy if the proposed diversion and the future wind phase were approved. We are satisfied that DEP amply considered the public's interest in granting the partial release of the conservation restriction. The DEP acted well within its authority and appropriately applied its expertise in determining that the solar project yields a

34

significant public benefit through provision of essential services.

The Pinelands CMP

Appellants argue that DEP violated N.J.S.A. 13:8B-6 by failing to properly consider the expected effect on the comprehensive land use protections of the Pinelands CMP and the T&E plant and animal species disrupted by development of the Business Park. Appellants also argue that DEP's approval and amended certificate partially releasing the conservation restrictions were based on the Pinelands Commission's illegal decision to accept $153,000 from Walters, as required by the 2010 amended MOA, without requiring mitigation involving replacement property in return, as mandated by N.J.A.C. 7:50-4.52(c)(2). Appellants posit that Walters' monetary payments to the Pinelands Commission did not satisfy the Pinelands CMP's minimum standards, as it did nothing to address the habitat loss from the redevelopment plan, which had justified the conservation restriction in the first place. Appellants also aver that on remand, DEP erred by not revisiting its choice to rely on the 2010 amended MOA and the Pinelands Commission's finding that the solar project would not irreparably harm the Pinelands and T&E species.

N.J.A.C. 7:50-4.52(c)(2) authorizes the Pinelands Commission to enter into an intergovernmental memoranda of agreement provided

35

A-2316-10T2

that any variation from the minimum Pinelands CMP standards "is accompanied by measures that will, at a minimum, afford an equivalent level of protection of the resources of the Pinelands than would be provided through strict application of the [Pinelands CMP] standards[.]" There are no measures specified in the regulation.

Here, DEP's choice to rely on the Pinelands Commission's decisions and the resulting 2006 MOA and 2010 amended MOA allowing renewable energy development projects on the Landfill was not arbitrary, capricious, or unreasonable. No one challenged the validity of the Pinelands Commission's decisions or the two MOAs, and the time to appeal them has long passed.

In any event, neither the GSPTA nor DEP's regulations preclude DEP from approving a diversion due to the presence of, or potential impact on, T&E habitat. DEP's regulations authorize, but do not require, the denial of a diversion application due to T&E species concerns. See N.J.A.C. 7:36-26.1(e). In the initial application, DEP appropriately relied on the Pineland Commission's findings about the solar project and ultimate agreement to amend the 2006 MOA. DEP's reliance was appropriate because the Pinelands Commission is charged with ensuring that the minimum standards, goals, and objectives of the Pinelands CMP are implemented and enforced, and because DEP and the Pinelands Commission have

concurrent authority with respect to T&E species protection within the Pinelands. See N.J.S.A. 13:18A-4; In re N.J. Pinelands Comm'n Resolution PC 4-00-89, 356 N.J. Super. 363, 377 (App. Div.), certif. denied, 176 N.J. 281 (2003).

The record shows that before DEP's initial decision to approve Stafford's diversion application, the Pinelands Commission reviewed the proposed solar project with regard to its conformance with the requirements of the Pinelands CMP. The Pinelands Commission concluded that the solar project was consistent with the Pinelands CMP and agreed to amend the 2006 MOA to allow the project to proceed. DEP appropriately considered the Pinelands Commission's analysis and similarly concluded that the solar project would not have any irreparable impact on T&E species. The DEP's decision to partially release the conservation restriction complied with the law, is supported by ample credible evidence in the record, and is not arbitrary, capricious, or unreasonable.

### III.

Appellants argue that DEP's diversion decision subverts the requirements of the Green Acres Act and the GSPTA because DEP failed to prevent the net loss of parkland, as required by N.J.S.A. 13:8C-32(b) (GSPTA), and N.J.A.C. 7:36-26.10(b) (Green Acres). Appellants also argue that DEP subverted the requirements of N.J.A.C. 7:36-26.1 and N.J.A.C. 7:36-26.10 and the GSPTA by failing

to require replacement lands on a four-to-one ratio, and require reasonably equivalent replacement property. Appellants further argue that DEP's finding of "ecologically significant" as it related to the two parcels Stafford proposed as replacement land does not satisfy N.J.A.C. 7:36-26.10(d).[3]

## Replacement Land Ratio

Appellants argue that N.J.S.A. 13:8C-32(b)(1) applies to property that will be "convey[ed]" to a use for other than conservation purposes, and the term "convey" is defined in N.J.A.C. 7:36-2.1 to mean "sell, donate, exchange, transfer, or lease for a term of [twenty-five] years or more." Because the Stafford/Walters lease term was thirty years, appellants posit that the four-to-one ratio applicable to a major diversion involving a fee simple conveyance of parkland in Table 1 of N.J.A.C. 7:36-26.10(g) also applies to Stafford's lease. In other words, they argue that a thirty-year lease is not a temporary conveyance, but a major diversion. Appellants further claim that

_____

[3] We decline to address appellants' additional argument relating to Stafford's use of Walters' lease payments based on a purported October 14, 2014 memorandum of understanding between Stafford and Walters. The document is not listed in the statement of items comprising the record on appeal, and there is no indication that DEP or the SHC considered it. R. 2:5-4; see also N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 278 (2007) (holding that we will not consider documents included in the appendix that were not presented below).

Stafford's solar project is a private commercial endeavor that is paid for, constructed by, and therefore sponsored by, Walters. Accordingly, they conclude that even if the lease was considered only as a surface easement over parkland, a four-to-one ratio of replacement land would be required.

Both the Green Acres Act, <u>N.J.S.A.</u> 13:8A-47(b)(1), and the GSPTA, <u>N.J.S.A.</u> 13:8C-32(b)(1), provide that property held for recreation and conservation purposes cannot be diverted to another use without DEP's and the SHC's approval. The Green Acres Act, <u>N.J.S.A.</u> 13:8A-47, does not require any replacement lands to offset diverted parkland. However, the GSPTA provides as follows:

> Approval of the commissioner and the [SHC] shall not be given unless the local government unit agrees to (a) <u>replace the lands with lands of equal or greater fair market value and of reasonably equivalent size, quality, location, and usefulness for recreation and conservation purposes</u>, as approved by the commissioner, or (b) pay an amount equal to or greater than the fair market value of the lands, as determined by the commission, into the Garden State Green Acres Preservation Trust Fund.
>
> [<u>N.J.S.A.</u> 13:8C-32(b)(1) (emphasis added).]

Thus, <u>N.J.S.A.</u> 13:8C-32(b)(1) establishes a minimum one-to-one ratio for replacement lands.

The Green Acres regulations set forth the standards and procedures for DEP's and the SHC's approval of the disposal or

diversion of funded or unfunded parkland. N.J.A.C. 7:36-26.1(d)(3) states that an "applicant shall compensate for the disposal or diversion of funded or unfunded parkland with eligible replacement land . . . in accordance with . . . N.J.A.C. 7:36-26.10[.]"

N.J.A.C. 7:36-26.10(g) contains a table showing the minimum ratio of replacement land for diversions (Table 1). Table 1 establishes different replacement ratios for different types of major diversions, i.e., easements versus full fee interests, and for different types of project sponsors, i.e., public project sponsors versus private project sponsors. For example, diversions involving public project sponsors require a two-to-one ratio of replacement land, whereas diversions involving private project sponsors require a four-to-one ratio. When the diversion involves only a surface easement over parkland, public project sponsors require a one-to-one ratio, whereas private project sponsors require a four-to-one ratio. The term "sponsor" is not defined. However,

> the term "public" used in reference to a diversion or disposal denotes that the project for which the diversion or disposal is proposed is constructed by or sponsored by a public entity; and the term "private" used in reference to a diversion or disposal denotes that the project for which the diversion or disposal is proposed is not constructed by or sponsored by a public entity. The

A-2316-10T2

> classification of a diversion or disposal as
> public or private shall be determined by Green
> Acres based on the pre-application information
> provided by the applicant.
>
> [N.J.A.C. 7:36-26.10(h).]

Because the solar project was in the form of a lease, the amount of replacement land was not subject to any minimum acreage requirements in Table 1. Thus, only the GSPTA's statutory requirement in N.J.S.A. 13:8C-32(b)(1), that replacement lands should be of equal value and of reasonably equivalent size to the diverted land, applied to the solar project. Further, N.J.A.C. 7:36-26.10(c)(2)(ii), which covers leases of encumbered parkland, does not require any amount of replacement land as compensation for these temporary conveyances.

Accordingly, the DEP's decision to require a one-to-one ratio was consistent with N.J.S.A. 13:8C-32(b)(1); the policy objectives of N.J.A.C. 7:36-26.10(c)(2)(ii); and the fact that the parkland interest at issue in the Stafford/Walters lease would be a temporary, partial leasehold, and not a full fee interest. The lease arose from the larger redevelopment project, making the parties' relationship "a hybrid" of public and private sponsors.

Further, Table 1 does not set any ratio for temporary easements over parkland diverted to a solar project from a conservation restriction, and N.J.A.C. 7:36-26.10 is silent on

using replacement land for "a diversion of parkland that entails a lease or use agreement[.]" Thus, we rely on N.J.S.A. 13:8C-32(b)(1), which allows replacement lands "of reasonably equivalent size" to offset a diversion. The statute does not require a replacement ratio greater that one-to-one.

### Reasonably Equivalent Replacement Property

Appellants argue that DEP's finding of "ecologically significant" as it related to the two parcels Stafford proposed as replacement land does not satisfy N.J.A.C. 7:36-26.10(d). Appellants posit that the replacement and diverted lands have fundamentally different habitat types and cannot compensate for the loss of habitat and species from the proposed major diversion.

N.J.S.A. 13:8C-32(b)(1) provides that replacement lands shall be "lands of equal or greater fair market value and of reasonably equivalent size, quality, location, and usefulness for . . . conservation purposes[.]" N.J.A.C. 7:36-26.10(d) provides as follows, in pertinent part:

> Replacement land proposed by the applicant as compensation for a major disposal or diversion of parkland shall meet the following requirements:
>
> . . . .
>
> 5. For applications proposing replacement land as the only form of compensation, the proposed replacement land shall have a market value that is

equal to or greater than the parkland proposed for disposal or diversion;

6. The proposed replacement land shall be of reasonably equivalent or superior quality to the parkland proposed for disposal or diversion, including, but not limited to, location, accessibility, usefulness for recreation purposes, and value for ecological, natural resource and conservation purposes. . . ;

7. If the proposed replacement land is inadequate to meet the criteria in (d)5 and 6 above, the Department shall require the applicant to supplement its proposal with additional compensation in excess of that which would otherwise be required under Table 1 at (g) below. Such additional compensation may consist of either additional replacement land or monetary compensation, or both, and the amount of such compensation must be sufficient to compensate in full for any shortfalls in the market value or quality of the proposed replacement land[.]

Even if Stafford's proposed replacement lands do not precisely meet the standards in N.J.A.C. 7:36-26.10(d)(6) because they are wooded and not grasslands, DEP found that the replacement lands would provide breeding and foraging habitat for various T&E birds and the Northern Pine Snake. Accordingly, DEP concluded, correctly, that the proposed replacement lands were reasonably equivalent to the lands proposed for diversion in terms of value for ecological, natural resource, and conservation purposes. DEP also found that those parcels were already serving as habitat for

43

T&E species, and there was no evidence to support the claim that those parcels would not support the additional T&E species appellants found on the Landfill during the remand. Furthermore, market value of the replacement lands was appraised approximately 4.7 times higher than the market value of the diverted land. Thus, there is sufficient evidence that Stafford's replacement lands met the requirements in N.J.A.C. 7:36-26.10(d)(7). Deferring to DEP's expertise, we do not find its assessment arbitrary, capricious, or unreasonable.

IV.

Appellants contend the DEP's failure to comply with its own diversion rules renders its decision arbitrary, capricious, and unreasonable because there was no evidence supporting its conclusions on: (1) public benefits and needs for a solar energy facility; (2) the lack of irreparable harm to T&E species on the Landfill; and (3) no available feasible alternatives.

### Public Benefits and Needs

Appellants argue there was no evidence supporting DEP's conclusion that the solar project would fulfill a compelling public need or yield a significant public benefit by improving Stafford's delivery of essential services to the public or to any segment of the public having a special need, as required by N.J.A.C. 7:36-26.1. Appellants claim that Stafford provides no electricity to

its residents and that its receipt of Walters' lease payments is no indication that any of the essential services it already provides will be improved. Appellants also aver there is no evidence to support DEP's assertion that a solar panel facility will reduce the carbon footprint of the Business Park.

N.J.A.C. 7:36-26.1 provides as follows:

> (a) It is the Department's policy to strongly discourage the disposal or diversion of both funded and unfunded parkland. The use of parkland for other than recreation and conservation purposes should be a last resort, and should only be considered by a local government unit or nonprofit when the proposed disposal or diversion is necessary for a project that would satisfy a compelling public need or yield a significant public benefit as defined at (d)1 below.
>
> . . . .
>
> (d) No application for the disposal or diversion of parkland under this subchapter shall be approved by the Commissioner and the State House Commission unless the applicant . . . meets the following minimum substantive criteria:
>
> 1. The . . . diversion of funded or unfunded parkland is for a project that will:
>
> > i. Fulfill a compelling public need, as demonstrated by the applicant . . . by mitigating a hazard to the public health, safety or welfare; [or]
> >
> > ii. Yield a significant public benefit, as demonstrated by the applicant . . . by improving the delivery by the local government unit . . . or by an agent

> thereof, of essential services to the
> public or to a segment of the public
> having a special need[.]
>
> [(Emphasis added).]

Even though "[i]t is [DEP's] policy to strongly discourage the disposal or diversion of both funded and unfunded parkland[,]" N.J.A.C. 7:36-26.1(a), neither the GSPTA nor the Green Acres Act place an absolute ban on diverting land encumbered by a conservation or Green Acres restriction to a use other than recreation or conservation. Furthermore, nothing in those statutory or regulatory schemes prohibits DEP or the SHC from approving a diversion of encumbered parkland for solar energy purposes. In fact, N.J.A.C. 7:50-5.36(a) of the Pinelands CMP states that "[a] municipality may include in its master plan and land use ordinance provisions . . . solar energy facilities as a principal use in any Pinelands management area[.]"

The Legislature has defined "essential services" to mean the adequate supply of "heat, water, hot water, electricity, gas, and telephone service." See, e.g., N.J.S.A. 52:27D-224.2 (defining essential services in the context of multiple dwellings and requiring notification when essential services are disrupted). Here, DEP concluded that the solar project would yield a significant public benefit in the form of renewable energy for the commercial, residential, and public buildings in its public

redevelopment project, and solar energy was already being produced at the Business Park. DEP's findings are entitled to considerable deference given its expertise in environmental matters.

## T&E Species

Appellants argue that DEP erred by only relying on Zappalorti's reports and not consulting with DEP's Endangered and Nongame Species Program before approving the diversion, and by not obtaining a redetermination by the Pinelands Commission after Stafford revised its diversion application. Appellants further object to Yeany's weighing of the impact to T&E species, instead of having the Green Acres Program directly apply the Pinelands CMP's T&E regulatory standards to the changed circumstances on the Landfill site, and the new T&E species living there.

Because we afford DEP's considerable expertise and experience great deference when balancing development and conservation determinations, we reject appellants' arguments. Furthermore, as we have previously stated, the Pinelands Commission bears the ultimate responsibility for enforcing the provisions of the Pinelands Act and the CMP requirements. Petition of S. Jersey Gas Co., supra, 447 N.J. Super. at 476. Because the Pinelands Commission had approved the 2006 MOA to allow a larger project proposing renewable energy facilities on the capped Landfill, it

is doubtful the Pinelands Commission would not have approved a project proposing the use of less acreage of the capped Landfill.

Lastly, the evidence amply supports a finding that new T&E bird species had already arrived on the Landfill due to the enhanced grasses Walters planted. Since Walters also had constructed twelve percent of the solar project, occupying approximately 4.4 acres of the Landfill, the evidence supports DEP's conclusion that there would be no irreparable harm from the solar project to the T&E species on the Landfill. Furthermore, the evidence supports a finding that those species would leave within three to five years if the grasslands were not maintained and mowed, as would happen if the diversion for the solar project was not approved.

## Feasible Alternatives

Appellants argue that Stafford never reviewed making the project even smaller, and never provided a description of the methods it used to identify alternatives to the proposed diversion. Appellants also reject Stafford's finding that no feasible areas adjacent to or in proximity to the Landfill site were available because they were either occupied by the Garden State Parkway or were preserved areas of the Pinelands.

No application for a major diversion of parkland shall be approved by DEP and the SHC unless

48

the applicant has demonstrated to the Department's satisfaction, through the alternatives analysis required by N.J.A.C. 7:36-26.9(d)2, that there is no feasible, reasonable and available alternative to the disposal or diversion of funded or unfunded parkland. It shall be the Department's presumption that there is a feasible, reasonable and available alternative not involving parkland for the project for which an applicant seeks to divert or dispose of parkland. The applicant must rebut this presumption through the alternatives analysis in order to obtain the approval of the Commissioner and the [SHC] under this subchapter. If the applicant is not able to rebut this presumption, the Commissioner and the [SHC] may, in their discretion, approve an application for a major disposal or diversion of parkland based on the exceptional recreation and/or conservation benefit to be provided by the applicant[.]

[N.J.A.C. 7:36-26.1(d)(2).]

The alternatives analysis must identify each alternative course of action that could be taken to yield the significant public benefit to be derived from the project, including all alternatives presented at the scoping hearing and submitted by the public, and the alternative of locating the applicant's project on the proposed replacement land. N.J.A.C. 7:36-26.9(d)(2).

Here, the purpose of the solar project was to provide renewable energy to a public redevelopment project. For its original and amended diversion applications, Stafford explained

A-2316-10T2

in detail how the alternatives to the proposed solar project were not feasible, reasonable, or available.

For purposes of an alternatives analysis, "an alternative may be considered not feasible" if it "would bring about unresolvable logistical problems[.]" N.J.A.C. 7:36-26.9(e)(1). In addition, an alternative may be considered "not reasonable" if it "[w]ould result in the essential project purpose . . . not being met[.]" N.J.A.C. 7:36-26.9(e)(2). The evidence supported DEP's finding that taking no action would not yield the significant public benefit of providing renewable energy to the Business Park, and would not help to maximize the green building objectives of the redevelopment plan. Further, constructing the solar project in another area of the redevelopment area would be too limiting. Rooftop spaces were already being used and areas farther away from the site presented logistical problems including increased costs and safety concerns. Finally, building a solar project beyond the redevelopment area itself would be constrained by public utilities laws and would result in inadequate production.

We conclude there was ample credible evidence in the record as a whole supporting DEP's and the SHC's decisions, and the decisions were not arbitrary, capricious, unreasonable, or contrary to law.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

50

A-2316-10T2